IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

| | |
|---|---|
| GREER'S RANCH CAFÉ, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 4:21-cv-00651-O |
| ISABELLA CASILLAS GUZMAN, *et al.*, | |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER**

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Christopher D. Dodge*
Christopher D. Dodge (MA Bar No. 696172)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

    I.    The Federal Government's Response to the COVID-19 Pandemic ...................... 2

    A.    Congress's initial COVID-19 relief programs. ..................................................... 2

    B.    Congress focuses on the need to support restaurants during the pandemic, while ensuring access to funds for minority and women-owned businesses. ......... 3

    C.    The American Rescue Plan and creation of the Restaurant Revitalization Fund. ...................................................................................................................... 4

    D.    The SBA, Administrator Guzman, and industry groups encourage all eligible applicants to apply to the RRF as soon as possible. ................................. 7

    E.    SBA begins accepting applications from all eligible businesses, with extraordinary demand from priority and non-priority applicants alike. ................. 9

    II.    Plaintiffs Greer's Ranch Café and Philip Greer Are Eligible to Apply to the RRF but Have Not Yet Done So ................................................................... 10

LEGAL STANDARDS ............................................................................................... 11

ARGUMENT .............................................................................................................. 11

    I.    Greer Lacks Standing Because He Has Not Applied For RRF Funds Despite Eligibility To Do So.................................................................................. 11

        A.    Greer has not suffered an injury-in-fact traceable to the priority period. ................................................................................................... 12

        B.    Greer's delay in applying for RRF funds has made any alleged injury unredressable. ................................................................................... 15

    II.    Even If Greer Had Standing, He Has Not Carried His Heavy Burden of Showing Entitlement to Extraordinary Temporary Relief ................................... 16

        A.    Greer has not shown a likelihood of success on the merits because the RRF is appropriately tailored to meet compelling government interests. ................................................................................................ 16

            1.    The priority application period serves a compelling government interest ....................................................................... 17

2.      The priority application period for socially and
        economically disadvantaged businesses is narrowly tailored
        to achieve the government's compelling interest..........................21

3.      The priority application period for women-owned
        restaurants is substantially related to an important
        government interest.....................................................................24

    B.      Greer has failed to allege any injury traceable to the priority period
            and thus cannot show irreparable harm. ....................................................24

    C.      The balance of equities and public interest favor Defendants. .................25

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) .......................................................................... 15, 17, 21, 22

*Allen v. Wright*,
   468 U.S. 737 (1984) .......................................................................... 13

*Andritz Sundwig GmbH v. United States*,
   No. CV 4:18-2061, 2018 WL 3218006 (S.D. Tex. July 2, 2018) .......................................... 25

*ASARCO Inc. v. Kadish*,
   490 U.S. 605 (1989) .......................................................................... 16

*Bezet v. United States*,
   276 F.Supp.3d 576 (E.D. La. Mar. 17, 2017) .......................................... 12

*Black Fire Fighters Ass'n v. City of Dallas*,
   905 F.2d 63 (5th Cir. 1990) .......................................................................... 11

*Bowen v. Owens*,
   476 U.S.  (1986) .......................................................................... 16

*Braunstein v. Arizona Dep't of Transp.*,
   683 F.3d 1177 (9th Cir. 2012) .......................................................................... 16

*Brotherhood of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*,
   457 F.3d 24 (D.C. Cir. 2006) .......................................................................... 13

*Bryant v. Holder*,
   No. 2:10-CV-76-KS-MTP, 2011 WL 710693 (S.D. Miss. Feb. 3, 2011) .......................................... 13

*Canal Auth. Of State of Fla. V. Callaway*,
   489 F.2d 567 (5th Cir. 1974) .......................................................................... 11

*Carney v. Adams*,
   141 S. Ct. 493 (2000) .......................................................................... 14, 15

*Cherokee Pump & Equip., Inc. v. Aurora Pump*,
   38 F.3d 246 (5th Cir. 1994) .......................................................................... 11

*Cisneros v. Fed. Bureau of Prisons*,
   No. CIV.A. H-05-3494, 2005 WL 3591012 (S.D. Tex. Dec. 30, 2005) .......................................... 12

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) .......................................................................... 17, 23

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................... 12

*Dean v. City of Shreveport*,
  438 F.3d 448 (5th Cir. 2006) ............................................................. 17

*Diamond v. Charles*,
  476 U.S. 54 (1986) ........................................................ 13, 19, 20, 21

*DynaLantic Corp. v. Dep't of,*
  *Def.*, 885 F. Supp. 2d 237 (D.D.C. 2012) ...................................... 17, 18

*Fortec Constructors v. Kleppe*,
  350 F. Supp. 171 (D.D.C. 1972) ......................................................... 14

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ............................................................................ 22

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
  695 F.3d 330 (5th Cir. 2012) ............................................................. 15

*Gratz v. Bolinger*,
  123 S. Ct. 2411 (2003) ....................................................................... 15

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
  723 F. Supp. 2d 1 (D.D.C. 2010), *aff'd*, 639 F.3d 1078 (D.C. Cir. 2011). ............................. 25

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) .............................................................. 16, 21, 23

*Heckler v. Mathews*,
  465 U.S. 728 (1984) ........................................................................... 13

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ............................................................. 15

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 11, 13, 16

*Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*,
  485 U.S. 360 (1988) ........................................................................... 16

*McConnell v. FEC*,
  540 U.S. 93 (2003) ............................................................................. 13

*Moose Lodge No. 107 v. Irvis*,
  407 U.S. 163 (1972) ........................................................................... 14

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ........................................................... 12

*Parvati Corp. v. City of Oak Forest, Ill.*,
  630 F.3d 512 (7th Cir. 2010) ............................................................ 13

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) ......................................................................... 12

*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ........................................................... 11

*Rancho Viejo Waste Mgmt. v. Laredo, Tex.*,
  364 F.Supp.3d 698 (S.D. Tex. Mar. 11, 2019) .................................. 12

*Ray Baillie Trash Hauling, Inc. v. Kleppe*,
  477 F.2d 696 (5th Cir. 1973) ............................................................ 14

*Rothe Dev. Corp. v. Dep't of,*
  *Def.*, 262 F.3d 1306 (Fed. Cir. 2001) ............................................... 17

*Rothe Dev., Inc. v. United States Dep't of,*
  *Def.*, 836 F.3d 57 (D.C. Cir. 2016), *cert. denied* 138 S. Ct. 354 (2017) .......................... *passim*

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ......................................................................... 17

*Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*,
  345 F.3d 964 (8th Cir. 2003) ...................................................... 22, 23

*Sims v. City of Dallas*,
  No. CIV.A.3:95-CV-177-X, 1996 WL 722052 (N.D. Tex. Dec. 5, 1996) ............................ 13

*Solon v. Gary Cmty. Sch. Corp.*,
  180 F.3d 844 (7th Cir. 1999) ............................................................ 13

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...................................................................... 11

*Stringer v. Whitley*,
  942 F.3d 715 (5th Cir. 2019) ............................................................ 12

*Tex. Health & Human Servs Comm'n v. United States*,
  166 F. Supp. 3d 706 (N.D. Tex. 2016) ............................................. 24

*Texas Voters All. v. Dallas Cty.*,
  495 F. Supp. 3d 441 (E.D. Tex. 2020) .......................................... 24, 25

*United States v. Hays,*
   515 U.S. 737 (1995) ........................................................................... 13

*United States v. Paradise,*
   480 U.S. 149 (1987) .................................................................... 17, 21

*United States v. Virginia,*
   518 U.S. 515 (1996) .................................................................... 16, 24

*Urban Areas v. Fed. Highway Admin.,*
   779 F. Supp. 2d 542 (W.D. Tex. 2011) .......................................... 24

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 (2021) ....................................................................... 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982) ......................................................................... 14

*Warth v. Seldin,*
   422 U.S. 490 (1975) ......................................................................... 14

*W. States Paving Co., Inc. v. Wash. State Dep't of Transp.,*
   407 F.3d 983 (9th Cir. 2005) ...................................................... 17, 22

*Williams v. Parker,*
   843 F.3d 617 (5th Cir. 2016) ........................................................... 13

*Wygant v. Jackson Bd. of Educ.,*
   476 U.S. 267 (1986) ......................................................................... 17

## STATUTES, RULES, AND OTHER AUTHORITIES

15 U.S.C. 632 ............................................................................................ 5

15 U.S.C. § 637 .............................................................................. 6, 7, 23

Pub. L. No. 95-507 § 201 (1978) ........................................................... 18

Pub. L. No. 116-123, 134 Stat. 146 (2020) .............................................. 2

Pub. L. No. 116-136, 134 Stat. 281 (2020) .............................................. 2

American Rescue Plan Act,
   Pub. L. No. 117-2 (2021) ................................................................... 4

Paycheck Protection Program and Health Care Enhancement Act,
   Pub. L. No. 116-139, 134 Stat. 620 (2020) ...................................... 2

Federal Rule of Civil Procedure 5(b)(2) ................................................................... 27

13 C.F.R. § 124.103 ......................................................................................... 6, 23

13 C.F.R. § 124.104(c) ........................................................................................ 7

Business Development Program, U.S. Small Bus. Admin.,
   https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-
   development-program .................................................................................... 6

H.R. 793, 116th Cong. (2021) ............................................................................... 5

H.R. 7197, 116th Cong. (2020) .............................................................................. 5

H.R. Rep. No. 92-1615 (1972) .............................................................................. 18

H.R. Rep. No. 94-468 (1975) ............................................................................... 18

H.R. Rep. No. 94-1791 (1977) .............................................................................. 18

H.R. Rep. No. 95-1714 (1978) .............................................................................. 18

H.R. Rep. No. 100-450 (1987) .............................................................................. 18

H.R. Rep. No. 117-7 (2021) .................................................................... 3, 4, 19, 25

Robert W. Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence of Early-Stage
   Losses from the April 2020 Current Population Survey*,
   NBER (June 2020), https://www.nber.org/papers/w27309 ...................................... 20

SBA, *Restaurant Revitalization Fund: Learn How to Apply*,
   https://youtu.be/fxi3EcB_BZ4?t=600 .................................................................. 8

## INTRODUCTION

Congress enacted the American Rescue Plan Act in March 2021 as a continuation of the federal government's efforts to provide relief to American individuals and businesses suffering the economic and public health effects of the COVID-19 pandemic.  With this latest Act, Congress aimed to provide critical support to America's beleaguered restaurant industry, which continues to acutely suffer as the country recovers from the pandemic.  The facts before Congress were stark—without this relief, many American restaurants will not survive and will shutter for good.

Plaintiffs Greer's Ranch Café and Philip Greer now seek to enjoin portions of those restaurant relief provisions, potentially delaying relief to tens of thousands of restaurants, on the basis that they employ racial and sex classifications.  But Plaintiffs lack standing to levy this challenge because by their own admission they have not yet applied for relief funds despite being eligible to do so for weeks. Defendants—Administrator Guzman and the Small Business Administration ("SBA")—encouraged all eligible applicants, including Plaintiffs, to apply for relief as soon as possible.  Plaintiffs' choice not to apply, despite their own professed eligibility to do so, means that they have not suffered an injury fairly traceable to Defendants.  And because claims on the relief fund, including from tens of thousands of applicants similarly situated to Plaintiffs, now dwarf the allotment of funds provided by Congress, Plaintiffs' claims likely are no longer redressable.  The fact that Plaintiffs can no longer obtain relief due to their own delay is, further, an exceptionally strong reason to deny their request for a temporary restraining order, as such an order would harm the public interest by delaying critical relief to America's restaurants while failing to provide any remedy for Plaintiffs.

Plaintiffs' claims fail also on the merits.  In providing this fresh round of relief, Congress acted on extensive evidence showing that certain groups of restaurant owners—including women, veterans, and socially and economically disadvantaged individuals—have borne an outsized burden during the pandemic due to past and present discrimination resulting in a lack of access to earlier COVID relief funding.  In response, Congress crafted a narrow plan that, while permitting all eligible restaurants to apply simultaneously, would for 21 days prioritize processing claims from restaurants owned by women, veterans, and socially and economically disadvantaged individuals. For the last category,

Congress incorporated a race-conscious presumption as a non-exclusive mode of showing priority. Because Congress narrowly tailored this priority period and presumptive eligibility to serve a compelling government interest—and in the case of its sex-conscious provisions, substantially related to achieving an important government objective—those provisions of the Act are constitutional.

## BACKGROUND

### I.     The Federal Government's Response to the COVID-19 Pandemic

In January 2020, the first reported case of the novel coronavirus was identified in North America, ushering in a series of federal government actions intended to combat both the public health and economic consequences of the emerging pandemic, which continue to this day.  SBA has been at the forefront of many of those efforts.

#### A.     Congress's initial COVID-19 relief programs.

On March 6, 2020, Congress passed the Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020, which deemed the coronavirus a disaster for purposes of § 7(b)(2)(D) of the Small Business Act, allowing the SBA to make Economic Injury Disaster Loans ("EIDL") available to eligible small businesses.  *See* H.R. 6074, Pub. L. No. 116-123, 134 Stat. 146 (2020).  On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which established the Paycheck Protection Program ("PPP"), provided $349 billion to fund the program, and provided funding for a new EIDL advance grant program.  H.R. 748, Pub. L. No. 116-136, 134 Stat. 281 (2020).  The PPP provides small businesses with SBA-backed loans that can be used to cover certain expenses during the COVID-19 crisis and are 100 percent forgivable if the money is used in accordance with program requirements.  The $349 billion in PPP funds were soon exhausted, and Congress enacted another law appropriating additional funding for the PPP, EIDL loans, and EIDL advance grants. Paycheck Protection Program and Health Care Enhancement Act, H.R. 266, Pub. L. No. 116-139, 134 Stat. 620 (2020).

### B.   Congress focuses on the need to support restaurants during the pandemic, while ensuring access to funds for minority and women-owned businesses.

Following the initial rush to implement COVID relief, Congress' attention turned to the particular impact of the COVID-19 pandemic and related shutdowns on the restaurant industry. The House Committee on Small Business "held many hearings and forums . . . on a wide variety of subjects relevant to pandemic aid programs," including hearings that discussed lessons learned from prior COVID relief programs and the needs of small businesses, including restaurants. H.R. Rep. No. 117-7, at 457 (2021). Two important themes emerged during these hearings—*first*, that special support was needed for the restaurant industry (and the hospitality industry writ large), and *second*, that targeted relief was needed for minority and women-owned businesses, many of whom the prior relief programs had failed to reach due in part to prior discrimination. *Id.*

On June 17, 2020, the Committee on Small Business held a hearing entitled "Paycheck Protection Program: Loan Forgiveness and Other Challenges." *See* Memo. from N. Velázquez, Chairwoman, Comm. on Small Bus. to Members, Comm. on Small Bus. (June 17, 2020) (App. 001). One topic of discussion at that hearing was "the impact the PPP has had on traditionally underserved business communities," including reports that "more needs to be done to ensure minority-owned businesses are fully able to access the program." *Id.* at 3.

On July 15, 2020, the Committee on Small Business held a full committee hearing entitled "Long-Lasting Solutions for a Small Business Recovery," which addressed "recovery efforts to stimulate small business growth following the Great Recession, barriers to recovery, and some of the industries that have been disproportionately impacted by COVID-19." *See* Memo. from N. Velázquez, Chairwoman, H. Comm. on Small Bus. to Members, H. Comm. on Small Bus. (July 15, 2020) ("July 15, 2020 Memo.") (App. 006). At this hearing, the committee discussed efforts to shore up small businesses during the pandemic. *See generally Long-Lasting Solutions for a Small Business Recovery: Hearing Before the H. Comm. on Small Bus.*, 116th Cong. (2020). In a memorandum released before the hearing, Chairwoman Velázquez stated that "[a]ny additional COVID-19 legislative packages should prioritize lending and relief to the smallest businesses, as well as underserved businesses, given that these

businesses had trouble accessing or were denied PPP and EIDL loans and grants." *See* July 15, 2020 Memo. at 6 (App. 011).

Hearings on these topics continued into this year.   On February 4, 2021, the House Subcommittee on National Security, International Development, and Monetary Policy of the Committee on Financial Services held a hearing entitled "Supporting Small and Minority-Owned Businesses Through the Pandemic," which focused on "understand[ing] why aid to minority-owned businesses was delayed" in earlier COVID-relief bills and "helping to lay the groundwork for how [Congress] can do better going forward."   *Supporting Small Bus. & Minority-Owned Bus. Through the Pandemic: Virtual Hearing Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 2-3 (2021) (statement of Rep. Jim A. Hines, Chairman, Subcomm. on Nat'l Sec., Int'l Dev. & Monetary Policy).   That hearing specifically examined the "vital" need to understand why small and minority-owned businesses suffered delayed access to COVID-19 relief funds that larger, well-connected businesses were able to reach.   *Id.*

C.     **The American Rescue Plan and creation of the Restaurant Revitalization Fund.**

On March 11, 2021, Congress enacted the American Rescue Plan Act, which provides widespread COVID-related relief to the American people and businesses, including restaurants. *See* American Rescue Plan Act, Pub. L. No. 117-2 (2021) ("ARPA").   ARPA "takes a multipronged approach to tackle the public health and economic crises resulting from the COVID-19 pandemic." H.R. Rep. No. 117-7 at 3 (2021).   The House Report accompanying the bill makes clear that Congress was focused on the ways in which the nation's "most vulnerable communities are forced to bear the brunt of" both the coronavirus pandemic and the resultant economic crisis "as underlying health and economic inequities grow worse."   *Id.* at 2.   The House Report explained that "underlying racial, wealth, social, and gender disparities are exacerbated by the pandemic," that "[w]omen – especially mothers and women of color – are exiting the workforce at alarming rates," and that "eight out of ten minority-owned businesses are on the brink of closure."   *Id.* at 2.   The Act is intended to "provide crucial support for the hardest-hit small businesses, especially those owned by entrepreneurs who have experienced systemic discrimination."   *Id.* at 3.

As relevant here, Section 5003 of ARPA established the Restaurant Revitalization Fund ("RRF") and appropriated $28.6 billion to the fund for fiscal year 2021.[1]  ARPA § 5003(b)(1)-(2). Section 5003 makes numerous businesses eligible for an RRF grant, including those qualifying as "a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom" and certain other premises.  *Id.* § 5003(a)(4).  ARPA further explains that, subject to the prioritization scheme described below, the SBA "shall award grants to eligible entities in the order in which applications are received by the Administrator."  *Id.* § 5003(c)(1).  Nothing in ARPA, however, prioritizes certain kinds of restaurants over others for purposes of RRF grant *eligibility*.

While ARPA made numerous kinds of small businesses eligible for RRF funds, the Act further included separate provisions that prioritized processing grants for certain businesses.  Specifically, Section 5003 instructs that in the first 21 days that grants are awarded through RRF, the SBA:

> shall prioritize awarding grants to eligible entities that are small business concerns owned and controlled by women (as defined in section 3(n) of the Small Business Act (15 U.S.C. 632(n)), small business concerns owned and controlled by veterans (as defined in section 3(q) of such Act (15 U.S.C. 632(q))), or socially and economically disadvantaged small business concerns (as defined in section 8(a)(4)(A) of the Small Business Act (15 U.S.C. 637(a)(4)(A))).

ARPA § 5003(c)(3)(A).  Critically for purposes of this motion, however, these prioritization provisions concern only SBA's timing for *processing* a particular subset of applications, and *not* when different kinds of restaurants become *eligible* to apply for such relief.  *See* SBA, *Restaurant Revitalization Fund – When to apply* (App. 043).

ARPA, through reference to the Small Business Act, states that a business is "owned and controlled by women" if at least 51 percent of the business is owned by one or more women, and the management and daily business operations of the business are controlled by one or more women.  15 U.S.C. § 632(n).  Similarly, a business is "owned and controlled by veterans" if at least 51 percent of the business is owned by one or more veterans and the management and daily operations of the

---

[1] Many of the RRF's features, including the priority period discussed *infra*, originated in the RESTAURANTS Act previously proposed by Rep. Earl Blumenauer, which would have created a $120 billion fund to support restaurants during the pandemic.  *See* H.R. 7197, 116th Cong. (2020); H.R. 793, 116th Cong. (2021).

business are controlled by one or more veterans. *Id.* § 632(q)(3). Under Section 8(a) of the Small Business Act, a "socially and economically disadvantaged small business concern" is at least 51 owned by "one or more socially and economically disadvantaged individuals," "an economically disadvantaged Indian tribe," or "an economically disadvantaged Native Hawaiian organization," where the management and daily business operations are controlled by the same.[2] *Id.* § 637(a)(4)(A)).

Section 8(a) defines "socially disadvantaged individuals" to include "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(5). The RRF application adopts this statutory definition, and its instructions further provide that individuals who are members of the following groups are "presumed to be socially disadvantaged: Black Americans, Hispanic Americans, Native Americans (including Alaska Natives and Native Hawaiians), Asian Pacific Americans, and Subcontinent Asian Americans." App. 33. Those designated groups track the groups identified in SBA regulations related to Section 8(a). *See* 13 C.F.R. § 124.103(b)(1). Under those regulations, a presumption may be rebutted with "credible evidence to the contrary." *Id.* § 124.103(b)(3). And individuals who are not members of one of these groups are eligible for this program and may show social disadvantage by submitting evidence that establishes that a distinguishing characteristic has contributed to substantial social disadvantage, which has limited their entry or advancement in the business world. *Id.* § 124.103(c)(1)-(2). An individual's race thus may create a presumption of social disadvantage, but individuals of other races may still be socially disadvantaged.

Section 8(a) defines "economically disadvantaged individuals" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially

---

[2] Section 8(a) of the Small Business Act permits the federal government to limit the issuance of certain government contracts to certain small businesses owned and controlled by socially and economically disadvantaged individuals that participate in the Section 8(a) program. 15 U.S.C. § 637(1); *see also* 8(a) Business Development Program, U.S. Small Bus. Admin., https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program. The D.C. Circuit has upheld the constitutionality of the Section 8(a) program. *See generally Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 61 (D.C. Cir. 2016), *cert. denied* 138 S. Ct. 354 (2017).

disadvantaged." 15 U.S.C. § 637(6)(A). On the RRF application, the SBA states that in assessing economic disadvantage, it will look at an individual's net worth, average income over the past three years, and the fair market value of the individual's assets. *See* App. 034. If an individual exceeds certain thresholds on any of those three metrics, he or she "will generally be deemed not to be economically disadvantaged." *Id.* This approach largely tracks SBA regulations related to Section 8(a). *See* 13 C.F.R. § 124.104(c). Because the priority period is open to "socially and economically disadvantaged" individuals, a restaurant owner who is presumptively socially disadvantaged must also be economically disadvantaged in order to participate in the priority period.

### D.   The SBA, Administrator Guzman, and industry groups encourage all eligible applicants to apply to the RRF as soon as possible.

Consistent with ARPA's plain text, the SBA, Administrator Guzman, restaurant advocacy groups, and trade magazines stressed that *all* eligible restaurants should apply for RRF grants as soon as the SBA opened the application portal. On April 19, 2021—two weeks before the RRF portal opened—SBA released official guidelines for RRF applications. *See* App. 035. The guidance reiterated that the term "[e]ligible entities" includes the various kinds of restaurants, eateries, and bars listed in Section 5003 of ARPA. *See* SBA, *Restaurant Revitalization Fund – Who can apply*. *See* App. 041. SBA guidance explained that during the 21-day priority period "SBA will accept applications from all eligible applicants but only process and fund priority group applications." *Id.* at *When to apply*.

On April 27, 2021, the SBA announced that the RRF application portal would open on May 3, 2021, and released additional guidance advising that "[a]ll eligible applicants are encouraged to submit applications as soon as the portal opens." *See* App. 053. The guidance made clear that although SBA would prioritize processing certain applications over the program's first 21 days, after that priority processing period "all eligible applications will be funded on a first-come, first-served basis." *Id.* SBA further released a Program Guide on April 28, 2021, which explained that "SBA will accept applications from all eligible Applicants" during the priority period. App 027. SBA social media accounts likewise announced that the "online application will remain open to any eligible establishment until all funds are exhausted." *See* @SBAGov (Apr. 27, 2021). *See* App. 056. SBA

further offered a series of webinars in the run-up to the RRF portal's opening to assist restaurants in the application process. *See* April 27, 2021 Press Release (App. 053).  Those webinars likewise made clear that "During the initial 21-day Priority Period, SBA will accept applications from all eligible Applicants." *See* SBA, *Restaurant Revitalization Fund: Learn How to Apply*, at 10:00 (https://youtu.be/fxi3EcB_BZ4?t=600).  Administrator Guzman reiterated the same point in public efforts to promote the RRF, publicly stating "We know that demand is going to exceed $28.6 billion. We encourage everybody to apply to try to access those funds as well as demonstrate the demand and need." Hawley, *What To Know About Restaurant Revitalization Funds, According to the Head of the Small Business Administration*, Food & Wine (April 30, 2021) (App. 059).

National groups echoed the advice from SBA and Administrator Guzman.  On April 28, 2021, the National Restaurant Association published a guide for applying for RRF grants, the first line of which was "**All eligible applicants should plan to apply the day the RRF program portal opens.**" *See* App. 062 (emphasis in original).  The Guide instructed that while priority groups would have their applications processed over the first 21 days of the program, "[a]n eligible applicant that is not in a priority group will not be ruled ineligible if they apply during the prioritization period." *Id.* Subsequent FAQ released by the National Restaurant Association on April 30, 2021, similarly explained that "SBA will accept applications from all eligible applicants during the first 21 days, but will only distribute funds for approved applications that have self-certified as meeting the eligibility requirements for priority ownership." *See* App. 069.

Texas-based groups similarly stressed the need for any eligible business to apply for RRF grants as soon as possible.  The Texas Restaurant Association, for example, announced guidance for RRF applications on April 27, 2021, explaining to Texas restaurant owners that "[t]he SBA has confirmed that even those who are not included in the priority groups can still submit their application as the portal opens to get in line," and therefore recommended that "**for everyone who plans to apply, please make sure you are preparing now, so you're ready to submit your application . . . as soon as the portal opens.**" *See* App. 078 (emphasis in original).  The association elsewhere, in

**Defendants' Response to Plaintiffs' TRO Motion – Page 8**

detailed guidance on the RRF, reiterated that "SBA will accept applications from all eligible applicants during the first 21 days." *See* App. 092.

Texas-based news outlets echoed the advice to apply promptly.   An April 28 article in Texas Border Business described RRF's prioritization scheme but explained that "[a]ll eligible applicants are encouraged to submit applications as soon as the portal opens." *See* App. 100.  The City of Fort Worth put out its own news release encouraging its restaurants to apply, explaining that "[a]ll eligible applicants are encouraged to submit applications as soon as the portal opens." *See* App. 104.  On May 2, the eve of the portal's opening, the Dallas-Fort Worth area Fox 4 news channel ran a story announcing funds would be disbursed on a "first come, first-serve basis." *See* App. 107.

### E.   SBA begins accepting applications from all eligible businesses, with extraordinary demand from priority and non-priority applicants alike.

SBA began accepting applications through the RRF portal on May 3, 2021. *See* Compl. ¶ 8. The Dallas Morning News reported on the day the portal opened that the SBA would begin "accepting applications from all eligible businesses at 11 a.m." and that the "$28.6 billion is expected to go quickly" with applications "reviewed on a first-come, first-served basis." *See* App. 109.  The Texas Restaurant Association also put out a press release with the headline "Texas restaurants should submit their applications as soon as possible," and explained that "application numbers on the first day will be through the roof" and that "it's likely the $28.6 billion will be depleted quickly." *See* App. 110.  It therefore recommended that "Business owners qualified to apply for grants should plan to submit their application as soon as possible." *Id.*

Demand for RRF grants was immediate and overwhelming from priority and non-priority businesses alike.  On May 5, 2020, SBA reported that it received approximately 186,000 applications in two days, with roughly an equal split between priority and non-priority businesses. *See* App. 114. That announcement indicated that the $28.6 billion pot of funds allocated by Congress was likely to be rapidly exhausted, as President Biden previously explained the funding was intended "to be able to help about 100,000 restaurants and other eligible businesses—fewer than those that already applied in the first 48 hours of the website being operational."  New York Times, *Restaurants and Bars Rush to*

*Apply for New Federal Aid Program* (May 5, 2021) (App. 117). The Dallas Morning News again reported on May 11 that "applications are open to all eligible business at this time," noting that RRF grants were "widely sought after" since launching on May 3. *See* App. 120.

On May 12, 2020, the SBA reported that in the first ten days of the portal being open, "the RRF program has received more than 266,000 applications representing over $65 billion in requested funds." TRO Mot., Ex. 2 at 4. The SBA's press release again noted that "[n]early half of the overall submitted applications came from women, veterans, and socially and economically disadvantaged business owners," with slightly more than half coming from non-priority groups. *Id.* It explained that $29 billion of requested funds came from these priority groups, with the remaining approximately $36 billion coming from non-priority applications. *Id.* In other words, the priority and non-priority applicants each separately sought funds greater than the $28.6 billion allocated by Congress.

## II.   Plaintiffs Greer's Ranch Café and Philip Greer Are Eligible to Apply to the RRF but Have Not Yet Done So

Plaintiff Greer's Ranch Café, owned by Plaintiff Philip Greer (collectively "Greer"), is a limited liability company operating in Erath County, Texas. *See* Compl. ¶¶ 3-4. Greer alleges that his restaurant is eligible for the RRF and that he intends to apply for such funds in the future but that he has not yet done so because he is a white, non-veteran, male who does not qualify as socially or economically disadvantaged. *Id.* ¶¶ 5-6, 9, 12; *see also* TRO Mot. at 3 (explaining "Mr. Greer and his restaurant are otherwise eligible for relief from the [RRF]"). Nonetheless, Greer admits that he has not yet applied for RRF funds despite his eligibility to do so. *See* Compl. ¶ 9; TRO Mot. at 3.

Greer filed his complaint on May 13, 2021, ten days after SBA began accepting applications from eligible restaurants such as his own and one day after the SBA announced that both priority and non-priority applicants had requested over $65 billion. *See* Compl.; TRO Mot., Ex. 2. He filed the instant TRO motion on May 16, 2021. *See* ECF Nos. 6-7. Later that evening the Court ordered that Defendants respond to the motion no later than 2:00pm CT on May 18, 2021. *See* ECF No. 7.[3]

---

[3] At this stage Plaintiff has moved exclusively for a temporary restraining order. *See* ECF No. 5. Should the Court grant such extraordinary relief, Defendants request the opportunity to submit supplemental briefing in response to any subsequent motion for a preliminary injunction. Defendants

## LEGAL STANDARDS

Temporary restraining orders are extraordinary and drastic remedies. *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). Such a remedy is "not to be granted routinely, but only when the movant, by a clear showing, carries [the] burden of persuasion." *Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990). "The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Canal Auth. Of State of Fla. V. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). The last two factors are typically combined when claims are brought against the government. *See Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

### I. Greer Lacks Standing Because He Has Not Applied For RRF Funds Despite Eligibility To Do So

To establish the existence of a case or controversy giving rise to Article III subject-matter jurisdiction, a plaintiff must meet the "irreducible constitutional minimum" for standing, which requires showing that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). Accordingly, "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021). Greer has not shown an injury-in-fact traceable to ARPA because by his own admission he has not applied for RRF funds despite eligibility to do so. And, further still, any alleged injury is now unredressable because Greer has waited to apply until well-past the point where RRF funds are likely to be exhausted, including solely by other non-prioritized applicants such as himself.

---

also further note that, although a written decision has not yet been published, another district court recently denied a motion for a temporary restraining order in a similar challenge. *See Vitolo v. Guzman*, No. 3:21-cv-176, ECF No. 20 (E.D. Tenn. May 17, 2021).

A.    Greer has not suffered an injury-in-fact traceable to the priority period.

An injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Stringer v. Whitley*, 942 F.3d 715, 720-721 (5th Cir. 2019). But no claimant "can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). By electing not to file an RRF grant application despite being eligible, and encouraged to do so for several weeks, Greer has not adequately alleged that he has suffered an injury-in-fact. *See* Compl. ¶ 9; *see also* Greer Decl. ¶¶ 9-10 (claiming that he "satisf[ies] each requirement" for eligibility under the RRF but has not applied). Such "self-inflicted harm doesn't satisfy the basic requirements for standing" because it "does not amount to an 'injury' cognizable under Article III" and, regardless, "would not be fairly traceable to the defendant's challenged conduct." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

A federal suit is over once the plaintiff has failed to show a non-conjectural and imminent injury from the defendant's challenged actions. It is irrelevant whether the plaintiff decides to impose other harms on himself because such self-inflicted damage adds nothing to the proper analysis. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415-17 (2013) (a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). While Greer indicates he intends to apply "as soon as possible" and once his application "becomes eligible for consideration," Greer Decl. ¶ 10, that claim is belied by his decision not to submit an application despite being eligible to do so as of May 3, 2021.[4] See *Amnesty Int'l USA*, 568 U.S. at 414.[5]

---

[4] Greer's complaint and declaration appear to conflate *eligibility* to apply with when his application will be *processed* based on the prioritization scheme. *E.g.*, Greer Decl. ¶¶ 9-10. There is no dispute that Greer is eligible to apply for an RRF grant and has been since the portal opened on May 3.

[5] Courts in this Circuit routinely find no standing when the plaintiff claims they were harmed by an application process in which they failed to participate. *See, e.g.*, *Rancho Viejo Waste Mgmt. v. Laredo, Tex.*, 364 F.Supp.3d 698, 701-02 (S.D. Tex. Mar. 11, 2019) (dismissing claimed loss as only conjecture after the plaintiff failed to apply for a landfill permit); *Bezet v. United States*, 276 F.Supp.3d 576, 598-99 (E.D. La. Mar. 17, 2017) (finding plaintiff seeking a transfer of a firearm failed to sufficiently allege an injury-in-fact because plaintiff never applied for such a transfer); *Cisneros v. Fed. Bureau of Prisons*, No. CIV.A. H-05-3494, 2005 WL 3591012, at *6 (S.D. Tex. Dec. 30, 2005) (where petitioner "fail[ed] to allege or show that she had applied for or had been accepted" into a rigorous boot camp she thus "fail[ed] to demonstrate the requisite injury"); *Sims v. City of Dallas*, No. CIV.A.3:95-CV-177-X, 1996 WL 722052,

Even if Greer claims that his present inability to obtain funds constitutes an injury, it is not "fairly traceable to the challenged action of the defendant[s]." *Lujan*, 504 U.S. at 560 (alterations omitted). Any causal chain between the priority period and Greer's inability to access RRF grants has been severed by his own decision to delay filing an application. "An injury is not fairly traceable to the provision if it 'stems not from the operation of [the provision] but from [the plaintiffs'] own . . . personal choice." *Bryant v. Holder*, No. 2:10-CV-76-KS-MTP, 2011 WL 710693, at *5 (S.D. Miss. Feb. 3, 2011) (quoting *McConnell v. FEC,* 540 U.S. 93, 228 (2003)); *see also Williams v. Parker*, 843 F.3d 617, 622 (5th Cir. 2016) (finding alleged "injury is not fairly traceable to the defendant" where plaintiff "made the decision, on its own, to pursue" a particular course of action); *Brotherhood of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) ("This injury was not in any meaningful way 'caused' by the Board; rather, it was entirely self-inflicted and therefore insufficient to confer standing upon the Union."); *Solon v. Gary Cmty. Sch. Corp.*, 180 F.3d 844, 850 (7th Cir. 1999) (concluding "any harm that the plaintiffs did suffer was instead traceable to their own unfettered choices"). Any injury concerning access to RRF funds here was "entirely self-inflicted" by Greer's decision not to apply when eligible, and thus not traceable to the priority period. *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 518 (7th Cir. 2010) (collecting authority); *accord Diamond v. Charles*, 476 U.S. 54, 70-71 (1986) (party's liability for attorney's fees was a consequence of its own decision to intervene in the case and therefore could not be fairly traced to the law challenged).

Greer's burden to plead an injury traceable to the priority period is not lessened because his claim is constitutional in nature. "The rule against generalized grievances applies with as much force in the equal protection context as any other." *United States v. Hays,* 515 U.S. 737, 743 (1995). Even where the government itself is alleged to have engaged in racial discrimination, "such injury accords a basis for standing only to 'those persons personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984)). Thus, in *Warth v. Seldin*, the Supreme Court found that a home builders

at *2 (N.D. Tex. Dec. 5, 1996) (denying motion for temporary restraining order due to lack of injury where plaintiffs challenged promotion exam but were not eligible for promotion).

association lacked standing to obtain prospective relief against allegedly discriminatory zoning laws because it made "no averment that any member has applied to respondents for a building permit or a variance with respect to any current project."  422 U.S. 490, 516 (1975); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 489 n. 26 (1982) (rejecting the notion that every citizen has standing to raise an equal protection claim); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166-167 (1972) (plaintiff lacked standing to challenge an organization's racially discriminatory membership policy where he never sought to become a member).

On the basis of *Moose Lodge No. 107*, the Fifth Circuit has previously found that a plaintiff lacked standing to challenge the very same Section 8(a) provisions at issue here.  *See Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 710 (5th Cir. 1973).  In that case, a refuse hauling business challenged the SBA's Section 8(a) program for awarding business to "socially or economically disadvantaged persons," on both statutory and constitutional grounds.  The Fifth Circuit concluded that "the plaintiffs in the present case have no standing to litigate the issue of racial discrimination in the administration of the section 8(a) program because they did not even apply for participation in the program." *Id.* at 710 (quoting *Moose Lodge No. 107*, 407 U.S. at 166); *see also Fortec Constructors v. Kleppe*, 350 F. Supp. 171, 172 (D.D.C. 1972) (reaching the same conclusion in a similar challenge to Section 8(a)).  The Fifth Circuit "decline[d] the invitation" to "resolve a question that is not now before us." *Ray Baillie*, 477 F.2d at 710.  The Court should similarly dismiss Greer's challenge for lack of standing.

The only contrary support cited by Greer in either his complaint or motion is *Carney v. Adams*, 141 S. Ct. 493, 499-500 (2000).  *See* Compl. ¶ 9.  But that case further confirms that Greer has failed to allege an adequate injury.  The Supreme Court there concluded that a plaintiff challenging the Delaware constitution's judicial balancing requirements failed to demonstrate that he was "able and ready" to apply for a judicial vacancy absent the constitutional provision.  *Carney*, 141 S. Ct. at 501-502.  The Court concluded plaintiff failed to show a concrete injury because his desire to apply for a judicial position was based purely on a conclusory assertion that he would do so—much like Greer's assertion here.  *Id.*  Those words "st[ood] alone without any actual past injury, without any reference to an anticipated timeframe, without prior judgeship applications, without prior relevant

conversations, without efforts to determine likely openings, without other preparations or investigations, and without any support evidence." *Id.* Greer, too, offers only the conclusory assertion that he will apply for an RRF grant, but that assertion is belied by his continuing failure to do so.

*Carney* also observed that similar equal protection cases involved more concrete injuries. *Id.* at 502-503. For example, describing *Gratz v. Bollinger*, the Court explained that a student had standing to challenge a university's admissions policy because he had "applied for admission to the university as a freshman applicant in the recent past and been rejected." *Id.* at 502 (citing 123 S. Ct. 2411 (2003)). Similarly, in *Adarand Constuctors, Inc. v. Pena*, the subcontractor challenging a race-based program "established standing by showing that it 'bids on every guardrail project in Colorado.'" *Id.* (quoting 515 U.S. 200, 212 (1995)). Unlike the challengers in these cases, but like the plaintiff in *Carney*, Greer has failed to adequately allege a sufficient injury traceable to ARPA in view of his continued choice not to apply for a program for which he otherwise claims to be eligible.[6]

## B. Greer's delay in applying for RRF funds has made any alleged injury unredressable.

Standing to seek temporary relief further requires Greer to "show that it is likely, not merely speculative that a favorable decision will redress the injury-in-fact." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012). Greer cannot make such a showing here. As explained, SBA has already received over $65 billion in requested relief from restaurants as of May 12—nearly one week ago. Approximately $36 billion of those requested funds came from restaurants, like Greer's, that do *not* qualify for prioritization. *See* TRO Mot., Ex. 2. Those funds *alone* are enough to exhaust the $28.6 billion fund established by Congress, even setting aside the additional $29 billion claimed by prioritized restaurants, all of whom filed before Greer in compliance with the RRF's requirement to "award grants to eligible entities in the order in which applications are received by the Administrator." ARPA § 5003(c)(1). Even if the Court entered the requested TRO, Greer's tardiness in seeking a grant all but certainly precludes him from obtaining funds that could, for example, "help

---

[6] Rule 23 requires a class representative have standing in his own right. *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014).

cover expenses that [Greer] incurred" during the pandemic.  Greer Decl. ¶ 8.  Thus, while Greer argues in his motion that the RRF is "likely to be depleted before Mr. Greer's application is eligible for consideration," that harm is traceable to Greer's own delay in seeking funds, regardless of the priority period, and no remedy from this Court can redress that injury.  *Cf. Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1186 (9th Cir. 2012) (dismissing claims for injunctive and declaratory relief as moot where suit came ten months after the challenged program was suspended).[7]  Because at this late stage redress for Greer is not traceable to the priority period, and ultimately contingent on the decisions of Congress, his claim lacks redressability.  *Lujan*, 504 U.S. at 561.

## II.   Even If Greer Had Standing, He Has Not Carried His Heavy Burden of Showing Entitlement to Extraordinary Temporary Relief

### A.   Greer has not shown a likelihood of success on the merits because the RRF is appropriately tailored to meet compelling government interests.

While Section 5003 in ARPA itself is race-neutral, the SBA regulations that it incorporates are race-conscious and therefore subject to strict scrutiny.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).  Under strict scrutiny, such race-conscious rules do "not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is satisfied."  *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  While strict scrutiny presents the government with a high bar, the Supreme Court has cautioned that it should not be interpreted as "strict in theory, but fatal in fact."  *Adarand*, 515 U.S. at 237.  Similarly, sex-based classifications require that the government show such rules "serve[] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  Because the prioritization scheme adopted by Congress serves compelling interests and

---

[7] Relief for Greer at this stage is dependent on Congress's decision to commit additional funds to the RRF.  But that is not sufficient to establish redressability—whether Greer's claims of harm can "be redressed by a favorable decision in this case depends on the unfettered choices made by independent actors not before the courts," namely Congress, "whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict."  *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989); *see also Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 485 U.S. 360, 373 (1988) (explaining "discretion about how best to spend money to improve the general welfare is lodged in Congress rather than the courts" (citing *Bowen v. Owens*, 476 U.S. 350, 345 (1986))).

is narrowly tailored, it passes both strict and intermediate scrutiny.

       1.    *The priority application period serves a compelling government interest.*

Congress here found a compelling interest in remedying the effects of past and present discrimination based on extensive factfinding showing that socially and economically disadvantaged business owners have less access to capital and credit due to discrimination in the public and private sectors, and in particular capital and credit provided through earlier COVID relief efforts. The government likewise has a compelling interest in supporting small businesses owned by socially and economically disadvantaged small business owners who have borne an outsized burden of the economic harms of COVID-19 pandemic. And in particular, "[t]he federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination." *W. States Paving Co., Inc. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005). These interests are consistent with prior cases finding that the federal government has a compelling interest in "remedying the effects of past or present racial discrimination." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996); *United States v. Paradise*, 480 U.S. 149, 166 (1987) ("It is now well established that government bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination."); *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (same).[8]

Section 5003 expressly imports the term "socially and economically disadvantaged" from the Section 8(a) program. That program itself relied upon significant evidence establishing the government's compelling interest in "breaking down barriers to minority business development created by discrimination and its lingering effects." *DynaLantic Corp. v. Dep't of Def.*, 885 F. Supp. 2d 237, 251 (D.D.C. 2012). For example, a 1972 House Report described the problems confronting

---

[8] The government can meet its burden without conclusively proving the existence of racial discrimination in the past or present. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 292 (1986) (O'Connor, J., concurring)). Instead it must provide a "strong basis in evidence for its conclusion that remedial action was necessary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (quoting *Wygant*, 476 U.S. at 277). While Congress is not entitled to deference in its conclusion that race-based relief is necessary, that "does not mean that Congress is entitled to no deference in its factfinding." *Rothe Dev. Corp. v. Dep't of Def.*, 262 F.3d 1306, 1321 n.14 (Fed. Cir. 2001).

minority entrepreneurs, recognizing that minority small business owners experience racial and ethnic prejudice that leads to "almost insurmountable obstacles to business development."  H.R. Rep. No. 92-1615, at 18-19 (1972).  A subsequent report in 1975 further detailed how the "effects of past inequities stemming from racial prejudice have not remained in the past," result in present inequalities in the economic system for which "Congress has formulated certain remedial programs designed to uplift those socially or economically disadvantaged persons to a level where they may effectively participate in the business mainstream of our economy."  H.R. Rep. No. 94-468, at 1-2 (1975)); *see also* H.R. Rep. No. 94-1791, at 182 (1977) (detailing testimonial evidence describing "a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities").  When Congress codified the Section 8(a) program in 1978, it again concluded that "persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices."  Pub. L. No. 95-507 § 201 (1978); *see also* H.R. Rep. No. 95-1714 at 20-21 (describing findings showing "that many individuals are socially and economically disadvantaged as a result of being identified as members of a certain group" and that often "status as a minority can be directly . . . correlated with social disadvantagement").

Congress continued building upon these findings through the 1980's, concluding that disparities still existed between minority and non-minority businesses.  *See* H.R. Rep. no. 100-450, at 18 (1987).  Congress thus determined that "discrimination and the present effects of past discrimination have hurt socially and economically disadvantaged individuals in their entrepreneurial endeavors" and that "[i]t is a legitimate purpose of government to correct the imbalance caused by discrimination."  *Id.*  Over the past three decades, further evidence has shown that race-based denial of access to capital and credit has not diminished.  *See DynaLantic*, 885 F. Supp. 2d at 257-262 (summarizing evidence of barriers to minority business formation from the 1990s and 2000s).  While much of this evidence looked specifically at bidding for government contracts (the subject of the Section 8(a) program), Congress's findings consistently noted the significant obstacles in gaining access to credit for minority-owned small businesses.

Against that lengthy and detailed backdrop, Congress decided to establish a priority period for RRF applicants owned by "socially and economically disadvantaged individuals."   ARPA § 5003(c)(3)(A).  These historical findings were significantly buttressed by specific findings over the past year about the enduring hurdles that socially and economically disadvantaged individuals face in obtaining access to credit generally, and COVID-relief funds specifically due to the lingering effects of prior discrimination.  Congress has repeatedly noted the devastating impact that COVID-19 has had on many small businesses, but it has also specifically recognized that "underlying racial, wealth, social, and gender disparities are exacerbated by the pandemic," that "[w]omen – especially mothers and women of color – are exiting the workforce at alarming rates," and that "eight out of ten minority-owned businesses are on the brink of closure."  H.R. Rep. 117-7, at 2 (2021).  Congress designed ARPA to remedy that issue in part by "provid[ing] crucial support for the hardest-hit small businesses, especially those owned by entrepreneurs who have experienced systemic discrimination."  *Id.* at 3.

Over the past year Congress has heard a parade of evidence offering support for the priority period prescribed by ARPA.  For example, on June 17, 2020 the House Committee on Small Business heard expert testimony describing how "[b]usinesses headed by people of color are less likely to have employees, have fewer employees when they do, and have less revenue compared to white-owned businesses" because of "structural inequities resulting from less wealth compared to whites who were able to accumulate wealth with the support of public policies," and that having fewer employees or lower revenue made COVID-related loans to those businesses less lucrative for lenders.  *See Paycheck Protection Program: Loan Forgiveness & Other Challenges: Hearing Before the H. Comm. on Small Bus.*, 116 Cong. 10 (June 17, 2020); *see also id.* at 59-60 (explaining that "businesses with existing conventional lending relationships were more likely to access PPP funds quickly and efficiently," and that minorities are less likely to have such relationships with lenders due to "pre-existing disparities in access to capital").

Similarly, on July 15, 2020, the House Committee on Small Business held a hearing specifically addressing the impact of COVID-19 on minority and women-owned businesses.  Chairwoman Velázquez entered evidence into the record showing that "[t]he COVID-19 public health and economic crisis has disproportionally affected Black, Hispanic, and Asian-owned businesses, in

addition to women-owned businesses" and that "minority-owned and women-owned businesses were particularly vulnerable to COVID-19, given their concentration in personal services firms, lower cash reserves, and less access to credit." *See* July 15, 2020 Memo. at 4-5 (citing Robert W. Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey*, NBER (June 2020), https://www.nber.org/papers/w27309).[9]   Witnesses at the hearing emphasized the "[u]nderrepresentation by women and minorities in both funds and in small businesses accessing capital." *Long-Lasting Solutions for A Small Business Recovery: Hearing Before the Comm. on Small Bus.*, 116 Cong. 6, 16 (2020) (further noting that "[t]he amount of startup capital that a Black entrepreneur has versus a White entrepreneur is about 1/36th").   And studies entered into the record confirmed that "[g]ender and race influence small business owners' ability to access credit." *Id.* at 55-56 (Brown, Kenyon, Robinson, *Filling the U.S. Small Business Funding Gap* (Feb. 2020) (describing the numerous reasons why such business owners lack access to credit)).   Michigan State professor Dr. Lisa Cook noted that in many cases, minority-owned businesses struggled to access earlier COVID relief funding, such as PPP loans, "due to the heavy reliance on large banks, with whom they have had historically poor relationships." *Id.* at 10 (statement of Dr. Lisa D. Cook).   Subsequent hearings held by Congress in 2021 continued to build upon this already substantial record showing that minority and women-owned businesses lack access to capital and credit generally, and specifically suffered from inability to access earlier COVID-19 relief funds.   *See, e.g.*, *Supporting Small Bus. & Minority-Owned Bus. Through the Pandemic: Virtual Hearing Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 60 (Feb. 4, 2021) (describing "long-standing structural racial disparities in small business ownership and performance"); *id.* at 70 (statement of Ctr. for Responsible

---

[9] The Committee heard specific evidence detailing racial discrepancies in how minority-owned businesses fared during the pandemic. See *Long-Lasting Solutions for A Small Business Recovery: Hearing Before the Comm. on Small Bus.*, 116 Cong. 6 (2020) (discussing the "catastrophic failure of minority-owned small businesses" including estimates that "while 22 percent of small businesses" overall, "32 percent of Hispanic-owned small businesses and up to 41-percent of Black-owned businesses" are now out of business); *see also id.* at 10 (statement of Dr. Lisa D. Cook, Prof. of Economics, Michigan State Univ.) (discussing how "[f]orty-one percent of African American businesses reported being closed compared to 35 percent overall" and that one study "reports that 45 percent of Black and Latino businesses will close by the end of the year without more relief.").

Lending describing present-day "overtly discriminatory practices by lenders" and "facially neutral practices with disparate effects" that deprive minority-owned businesses of access to capital).

Against this weighty mountain of evidence considered by Congress, Greer argues only that there is "no conceivable justification" for the priority period.  TRO Mot. at 5.  Although he correctly notes that COVID-19 has harmed restaurant owners of all stripes, that conclusory argument fails to grapple with the unique barriers that Congress found bar minority and women-owned businesses' access to capital, and in particular to critical COVID-19 relief funds due to the lingering effects of prior discrimination.

        2.    *The priority application period for socially and economically disadvantaged businesses is narrowly tailored to achieve the government's compelling interest.*

The Supreme Court has identified several factors that are relevant in determining whether a racial classification is narrowly tailored, including "the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171.  "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative," though it does "require serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *see also Adarand*, 515 U.S. at 237-38 (courts must inquire "whether there was any consideration of the use of race-neutral means" to achieve goal).

Section 5003's priority period was not created in a vacuum; rather, it was developed in the shadow of a year-long effort to provide relief to small businesses suffering amidst the COVID-19 pandemic.  As noted during various Congressional hearings throughout 2020 and 2021, many of the government's earlier race-neutral relief programs did not reach minority-owned businesses, particularly during the first few days of those programs.  As a result, minority-owned business were often shut out of those relief programs altogether, exacerbating already significant impediments that the businesses face in accessing capital due to past and present discrimination.  *Id.*

The RRF priority period is also "appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate.'"  *Adarand*, 515 U.S. at 238 (quoting *Fullilove v.*

*Klutznick*, 448 U.S. 448, 513 (1980) (Powell, J., concurring)).  The priority period runs for the first 21 days of the program, ensuring that women and socially and economically disadvantaged business owners have an opportunity to access available funding; however, after this initial period, any business may receive funding.  Thus, this is a short duration program that will not outlast the discriminatory effects it is designed to eliminate.  Indeed, Congress only appropriated $28.6 billion to fund the RRF; if Congress wishes to provide more money to the fund, it will need to appropriate additional funds (and in the process, evaluate whether imposition of a new priority period is appropriate).  *Cf. W. States*, 407 F.3d at 994 (finding that a program complies with this requirement "because it is subject to periodic reauthorization by Congress"); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 972 (8th Cir. 2003) (same).

The RRF priority period includes a number of provisions designed to provide flexibility and minimize the burden on non-minority restaurant owners.  Contrary to Greer's argument that "restaurants owned by white men can[not] even be considered for relief under the program," a white male restaurant owner can still qualify for the priority period if he indicates that he is socially and economically disadvantaged.  And the net worth, income, and asset limitations "ensure that wealthy minorities who have not encountered discriminatory impediments do not receive an unwarranted windfall" through the RRF priority period.  *W. States*, 407 F.3d at 995 (addressing net worth limitations in context of a similar minority preference program set forth in U.S. Department of Transportation regulations); *Sherbrooke Turf*, 345 F.3d 964 at 972 (same).

Greer fails to explain specifically why the priority period is not narrowly tailored, instead broadly arguing that white men did not get special dispensation from the health and regulatory burdens of the pandemic.  *See* TRO Mot. at 6.  But that claim is based on a misunderstanding of the definition of "socially disadvantaged individuals."  Section 8(a) of the Small Business Act—and thus Section 5003 of ARPA, which adopts this definition—defines that term to include "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  15 U.S.C. § 637(5); *see also* App. 033 (adopting same definition into program guide for RRF); 13 C.F.R. § 124.103(a).  Even setting aside priority access for

veterans, the priority period therefore does *not* categorically exclude restaurants owned by white men from prioritization provided they could show that they qualify as socially disadvantaged, just as it does not entitle all minority-owned businesses to prioritization if they have failed to qualify as socially and economically disadvantaged.  The priority period is thus not over-inclusive because it is available to *all* "socially disadvantaged" owners, regardless of race, provided that they are also "economically disadvantaged." *Id.*  And Greer's argument again ignores the extensive findings that Congress made specifically concerning how the prioritized groups were deprived of adequate access to earlier rounds of COVID relief due to continuing inequities in access to capital and credit.

Greer's summary reliance on *Croson* (TRO Mot. at 6) does not aid his argument as the Supreme Court found there that the City of Richmond's plan for supporting minority-owned enterprises targeted a "compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."  *Croson*, 488 U.S. at 492.  But the Court found the city's plan swept too broadly because it imposed an express set-aside quota to compensate minority-owned contractors and failed to contemplate race-neutral alternatives.  *Id.* at 507.  Congress imposed no such quota here, as all eligible businesses were invited to apply for RRF funds.  Moreover, Congress adopted race-neutral alternatives for distributing relief funds in earlier COVID-relief packages but subsequently determined that these funds failed to sufficiently reach priority group businesses due to historical obstacles to sources of credit.  *See, e.g., Long-Lasting Solutions for A Small Business Recovery: Hearing Before the Comm. on Small Bus.*, 116 Cong. at 10.  Contrary to Greer's vague suggestion, the Supreme Court has "never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination."  *Grutter*, 539 U.S. at 328 (holding that a law school "has a compelling interest in attaining a diverse student body").

3. *The priority application period for women-owned restaurants is substantially related to an important government interest.*

Greer also challenges RRF's prioritization of women-owned restaurants.  *E.g.*, Compl. ¶ 14.  But his complaint and motion supply no independent reason for finding the sex-prioritization provisions of RRF unconstitutional apart from those also levied against the race-conscious provisions.

As detailed *supra* 20-21, Congress repeatedly made findings over the past year that women-owned businesses were "disproportionately affected" by the COVID-19 pandemic for similar reasons as minority-owned businesses, including "their concentration in personal services firms, lower cash reserves, and less access to credit." July 15, 2020 Memo. at 4-5.  In enacting the priority period, Congress did not rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533.  Instead, it relied on actual data regarding the impact of the COVID-19 pandemic on women-owned businesses, such as "one-in-four (23%) women-owned businesses were shut out of the PPP loan application process" and that of women who were able to apply for a PPP loan, "women asked for 40 percent less than the average small business owner." July 15, 2020 Memo at 5.  Greer raises no specific arguments that this aspect of the priority period fails to "serve[s] important governmental objectives" or is not "substantially related to achievement of those objectives." *Virginia*, 518 U.S. at 533.  The sex-conscious portion of the priority period is therefore also constitutional.

> **B.**     **Greer has failed to allege any injury traceable to the priority period and thus cannot show irreparable harm.**

To establish irreparable injury, Plaintiff "must demonstrate that the harm is 'real, imminent, and significant—not merely speculative or potential—with admissible evidence and a clear likelihood of success.'" *Tex. Health & Human Servs Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016) (quoting *Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011)).  But as explained *supra*, Greer has thus far failed to allege *any* injury-in-fact, never mind irreparable harm, because he has not exercised his undisputed right to file an RRF application, obtain a position in the queue, and potentially receive funding.  And because the appropriated RRF funds will almost certainly be exhausted even if Greer now files an application, his claim of harm is practically moot.  *See Texas Voters All. v. Dallas Cty.*, 495 F. Supp. 3d 441, 472 (E.D. Tex. 2020) (denying TRO where plaintiff "failed to meet the harm standard for standing" and "for the same reasons" concluding "the irreparable harm standard is not met under the preliminary injunction analysis").

**C.      The balance of equities and public interest favor Defendants.**

The balance of equities and public interest strongly weigh against issuing Greer's requested temporary restraining order.  Due to his delay in filing in an application, Greer now possesses no plausible likelihood of obtaining RRF dollars, even if the Court were to grant his proposed temporary restraining order, because claims from similarly-situated non-prioritized restaurants already substantially outsize the fund allotment provided by Congress.  Nonetheless, Greer seeks to enjoin operation of critical parts of the RRF as crafted by Congress, likely delaying the disbursement of critical funds to both priority and non-priority restaurants at a critical moment in the economic recovery from COVID-19.  In passing ARPA, the House Report stressed that "[a]lmost eleven months after shutdown orders and social distancing guidelines were implemented across our country, small businesses are struggling to stay open, retain workers, and remain viable."  H.R. Rep. No. 117-7, at 457 (2021).  The report further stated that in the wake of "full or partial shutdowns," "many restaurants may not survive." *Id.* at 457.  Delaying or impeding this much-needed aid to accommodate a hypothetical future claimant who has anyways missed the boat on RRF dollars threatens the viability of restaurants who are desperately waiting for RRF grants to clear, and therefore *strongly* weighs against issuing a temporary restraining order.  *See, e.g.*, *Andritz Sundwig GmbH v. United States*, No. CV 4:18-2061, 2018 WL 3218006, at *11 (S.D. Tex. July 2, 2018) (declining to issue preliminary relief "based on potential harm to a non-party"); *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 723 F. Supp. 2d 1, 10 (D.D.C. 2010) (finding that the "injury to third parties that would result from the preliminary injunction plaintiffs seek weighs strongly against granting plaintiffs' motion"), *aff'd*, 639 F.3d 1078 (D.C. Cir. 2011).

## CONCLUSION

Plaintiff's motion should be denied.  Because Plaintiff has not established standing, a dismissal without prejudice is also warranted at this time.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/ Christopher D. Dodge
Christopher D. Dodge (MA No. 696172)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

On May 18, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


<u>/s/ *Christopher D. Dodge*</u>
Christopher D. Dodge
Trial Attorney
United States Department of Justice